Our first case is 19-1390 Brooks v. CDOC and we're going to have the plaintiff split argument between Ms. Boettcher and Ms. Robbins. So I think you have that under control and you may proceed when you're ready. May it please the court. My name is Angela Boettcher and along with my co-counsel Ms. I'm going to focus my time on the mootness issue and Ms. Robbins is going to focus her time on the merits of the ADA. We reserve three minutes for rebuttal and will otherwise split our time equally. Our supervising attorney Mr. Matthew Cushing is on the line and available for questions if needed. As to mootness, the district court erred in finding that Mr. Brooks' ADA claim was moot. Now this court revived Mr. Brooks' ADA claim in 2018 and remanded the case to the district court for discovery and briefing on the merits. Just four months later as discovery was starting, defendant CDOC Sua Sponte transferred Mr. Brooks and voluntarily granted him the movement pass he had been requesting. They then argued to the district court that Mr. Brooks' case was moot. But the defendant's behavior did not moot the case because voluntary cessation of offending conduct cannot moot a case out, especially when defendants- voluntary secession? Yes, your honor. That is briefed in our opening brief. No, I mean before the district court. Oh yes, your honor. The district court at, and this is in the record at volume 7 page 561 footnote 6, acknowledged that Mr. Brooks both argued voluntary cessation and capable of repetition yet evading review and the district court ruled on it. Orally argued it in his briefing? I believe it was orally argued and then the district court did rule on that. I raised that point because I think we have the interesting problem here of things happening while the briefing has not been updated. And that point, I don't know if it was ever briefed. I know it was argued. Thank you. Did Mr. Brooks ask for kind of a system-wide injunctive relief or that would apply to other disabled prisoners or was the remedy only directed to him personally? Your honor, Mr. Brooks, while litigating pro se, did request system-wide relief. He requested relief that would follow him to any is not required for his case to not be moot because the voluntary cessation exception and the capable of repetition yet evading review exceptions to the mootness doctrine apply. First to defendant's choice to cease their offending conduct. The defendants bear the burden of showing that their conduct can't reasonably be expected to recur and that the effects of their behavior have been completely and irrevocably eradicated. But defendants have not met this burden. Mr. Brooks remains subject to policies allowing CDOC to transfer or revoke his accommodations at any time. And the defendants have not put any evidence into the record that their behavior or that the transfer and accommodation of Mr. Brooks is permanent in any ways. Excuse me. To get back to Chief Judge Timkovich's question, then, you are challenging policy system-wide or are you not? Yes, your honor. We're challenging that the defendant's CDOC does not properly train its employees in how to reasonably accommodate disabled inmates. And Mr. Brooks did challenge those policies and asked for relief that follows him at any institution. And he has the relief that he wants. He's succeeded in obtaining that at the Sterling facility, right? Well, your honor, he had. And, you know, this isn't on the record because we just recently found out, but CDOC has already revoked Mr. Brooks's movement pass. It was revoked as part of COVID lockdowns. And as those restrictions have eased, the CDOC has refused to reinstate it. I'm sorry, did I talk over someone trying to talk? No, that's not in the record, correct? That's correct. But this only goes to show, and we don't need to rely on that extra record fact, this only goes to show that if this case were affirmed as moot, the CDOC could pull Mr. Brooks's accommodation the very next day. You've already got this. We're not has the passes for diabetics also been suspended during the COVID lockdowns? I believe, yes, it was during COVID lockdowns. However, those lockdowns have been since eased and passes have begun to be issued again. And Mr. Brooks has again requested. Okay. So diabetics have now been reissued their passes. That's my understanding. Correct. But Mr. Brooks pass has not been reissued. That's correct. All right. We have to be careful about this because we have no record on this. Absolutely. And on the evidence in the record today, still Mr. Brooks's claim is not moot. And defendant's position is also wrong as a matter of policy. If the defendants were able to moot out Mr. Brooks's claim with their voluntary conduct, it incentivizes CDOC to just transfer every inmate who ever brings a claim for injunctive relief as a litigation strategy. Now I see I'm out of time out of respect for my co-counsel's time. I'm going to yield the rest of my time to her. All right. We'll turn to Ms. Robbins. May it please the court. My name is Asia Robbins and I will be addressing the merits of the title two issue. Your honor summary judgment was inappropriately granted on the question of diapers are reasonable accommodation for Mr. Brooks because a reasonable jury could very well decide that diapers do not provide meaningful access to Mr. Brooks's meals, especially in light of an alternative, easy to administer and effective accommodation that Mr. Brooks once had, but CDOC revoked and refused to reissue. And that is the movement pass in this case. Is reasonableness in your view always a or is it rather a question of law? Reasonableness must be a question of fact in this, in this instance and a question of fact, more so for the jury to decide. And the record is replete with evidence that shows that diapers, when presented to Mr. Brooks as the proper accommodation were unreasonable. In fact, CDOC's diet miss record. The question is, is reasonableness a question of fact or a question of law? So I think what Judge Dimitrovich is searching for, is it, do you have a case on point? Hopefully 10th circuit case. Yes, your honor. I do have a case right versus New York state department of corrections. And the proposition of that case is that a defendant is only entitled to summary judgment. If the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation, because there's a reference to the record in that case. What court is right from? That's, that's from the second circuit, your honor. However, reasonableness is a question of fact for the jury to decide, especially in this case where title two by this court's own precedent and Robertson versus Los Animas County Sheriff's department requires not just physical access under the reasonableness determination of the ADA, but meaningful access. And that itself is also a question. Mr. Robbins, I have a question. There is a document, uh, in the summary judgment proceedings called diet mischarge. Yes, you're familiar with that. Yes, your honor. And, uh, the state says that, uh, during the period when he was allowed in his past, and I think it's a three or four month period, March to June, uh, 2012, he missed 149 meals. Now, have you done a comparison or other comparable, uh, three to four month period? Yes, your honor. In fact, the record, how do the numbers compare and what are those periods? Yes, your honor. The record shows that in the eight month period directly after Mr. Brooks's, uh, movement past was in fact revoked. He missed, um, nearly two thirds of his meals. Um, and during one particularly dire three month period in direct contrast to, um, I need to work with confidence. Yes, your honor. So I want to work with three or four months periods, or I want to work with percentages, which means you're going to have to tell me what percentage of missed meals are 149 that the state claims during this three, four month period when he had the past. So I needed to know percentages for the other periods or I need to know absolute numbers for comparable periods of three or four months. Yes, your honor. During one comparable three month period, when Mr. Brooks was offered only diapers as an accommodation, um, the record reveals that Mr. Brooks would have been able to access nearly a half of his meals if you will, during the period when he had the movement past. And so this tells me during the period that the state says there were 149 missed meals when he had this past, what percentage of meals are those? He was able to access a little bit. He was able to access nearly, I think it was 55 to 60% of his meals when he had the past, as opposed to only being able to access 36% of his meals, um, to 20% of his meals when he did not have the past your honor. Um, depending on the time range. Do you have, can you translate those percentages to numbers? Um, I can't off the top of my head, your honor. I don't want to spend time pursuing where you were going. Yes, your honor. Um, I think it might be useful to spend the remainder of my time explaining, um, clearing up, um, a point of confusion between us and opposing council, um, opposing council admits on page seven of their answer brief and page 53, that if Mr. Brooks has just allowed the time to use the restroom before he goes into to get one his meals, then he has a 30 minute window where he will not suffer a flare up. And so the problem, the reason that Mr. Brooks requests the movement pass in this instance is because during the two hour trial poll period, when, um, when he could, his unit could be called to go to the dining hall. Um, all inmates are locked down in their cells and, um, Mr. Brooks does not have access to a restroom. So if Mr. Brooks is allowed the movement pass, if Mr. Brooks is allowed to know that he will go, um, to the, to the dining hall for child poll at 6am noon and 5pm, he will be able to access the restroom. And as defendants admit in their briefing, um, not be, not, not suffer a flare up during the time when he needs. Doesn't he have a toilet in his cell? No, your honor, he does not. He is in a dry cell at Sterling correctional facility. What was he in at Fremont? I believe he was also in a dry cell. Um, there's no, there's no record citation for this. Um, unfortunately we, we learned this from a, an interview with him and, um, and we were reticent to cite it in our briefing. However, I do feel like it is a pertinent point of law, um, for you, for this court to understand. The fact is important to this case, because what you've now said is the pass is tied to when he can use the bathroom and also when he can access meals. Yes, your honor. So you're telling us that Sterling, he's in a dry cell. Is that in the record or is that just what you discovered since outside the record? That's what we have discovered since outside the record. However, the lockdown procedures is in the record. Um, and the full detail is described on page 18 of our reply brief. However, I see him running. Isn't it, does the record indicate whether he was in a dry cell or not when he was at Fremont? The record, not what you know. No, your honor, it does not. Um, so then it appears that when Mr. Brooks was operating in Pro Se, which he was during the entire period when this record was being, um, composed, is it nobody, Mr. Brooks or the state put in any information about, uh, whether he was in a wet cell at Fremont or whether he was in a wet cell at, uh, uh, Sterling or which of the various prisons throughout the state have available wet cells? Uh, is that, is that a fair statement that the record has none of that information? Not, not that we are aware of your honor. Um, I do see that I'm running out of time. Because I'll, I'll give you some rebuttal. Um, but because, because of that, um, understanding was, did he wear an adult undergarment then, uh, full time? No, your honor. But Mr. Brooks' refusal to wear the undergarment does not weigh on the reasonableness of the undergarment in the first place. Um, because the, the proper accommodation was in fact unreasonable, um, Mr. Brooks was foisted, was the CDOC foisted an unreasonable choice upon Mr. Brooks. Uh, they said either go to the dining hall, wear the diapers, um, attempt to withhold these flare-ups, withhold the pain. And then when you can't resist any longer and are forced to defecate upon yourself, um, then you must incur risk of assault from other inmates and attempt to eat in that environment. Or the alternative choice is to not eat at all. And so that unreasonable choice is what CDOC has provided Mr. Brooks with their proper accommodation. And a reasonable jury would, would most likely agree that that is not a reasonable choice at all, your honors. All right. Well, let's, let's, um, hear from, uh, from Colorado now. Um, see Ms. Lawrence, are you? Yes. Good morning, your honor. Um, thank you. And your honor, if I could briefly address some of the points that were made in, um, opposing counsel's argument first, and I'd like to start with voluntary cessation. Um, in fact, Mr. Brooks in the lower court never argued or briefed voluntary cessation. Um, and this is the exact reason why arguments, um, as to exceptions to mootness shouldn't be considered for the first time on appeal. Had he raised that argument below, we could have presented evidence on that issue in a very straightforward way. Did he have the opportunity to brief that before the court heard the case on the merits? Your honor, presumably because what happened is between the time of the initial summary judgment meet, uh, briefing and the supplemental briefing, we had a motions hearing. And at that motions hearing was the first I found out and the court found out that he had in fact been given the pass he wanted. So in that hearing is when we address that issue. And then the, the court allowed supplemental briefing upon request on the issue of his eighth amendment claim. Well, he, he, he, he clearly argued, uh, in the hearing on before the district court that, uh, they could take this away again. The past didn't think that's correct. Your honor. The only remark he made in that in passing reference, any mootness exception was implying that it was capable of repetition, but I'd like to address that as well. So if you look at the capable of repetition doctrine there, the fact that he, that he, he, he says that, uh, he can be moved around. I mean, I don't understand how, if he raises generally the fact that this can be, uh, revoked again, uh, how that doesn't, you know, generally reflect upon at least for a say, uh, party that, that, uh, uh, they voluntarily cease this, but they could resume it. I mean, there's lots of overlap between, uh, those concepts aren't there. Your honor. I think the issue is I, I agree. He arguably raised one prong of the capable of repetition analysis, but he never addressed voluntary cessation, which requires proof that the CDOC acted basically in a way to deprive the court of jurisdiction. And that was never argued. No evidence was presented on it with respect to capable repetition. I understand. He argues that he could be transferred at any time, but under, um, applicable law and I'm referring to McAlpine versus Thompson, a hypothetical possibility isn't enough. And I can't emphasize enough that Mr. Brooks's history in the CDOC does not support this. Okay. Establish into that concept, uh, capable of repetition, uh, without a hypothetical, if, if, if they have ceased the conduct, uh, you know, if it's resumed as hypothetical, how can you address that otherwise? Because your honor, there's absolutely no evidence of that in the record. And what we're doing is reviewing the court's order on emotion for summary judgment. And what we need to look at is the undisputed facts presented to the court at that level. And there's no evidence that anything has been revoked. And again, what you were arguing then is that the way you establish capable of repetition, yet avoiding review is to demonstrate that they have actually resumed their conduct. That's what you're arguing. And that can't be true. It defies the definition of the concept. The concept requires that he established a reasonable possibility that the conduct will resume again in the future. And he has not done that. And there's no evidence in the record that supports that. Well, don't we have here the bare fact that he has been transferred? He went from Fremont to Sterling. Your honor, he has been, that's correct. In seven years time, he has been transferred once. And again, that's additional evidence to show that what he's implying could occur is extremely remote hypothetical possibility. He's been at Sterling for over, I'm sorry, your honor. He's been at Sterling since April of 2018. And he was at Fremont for six years before that. How many years does he have to serve? Does he have like 60 years or something to serve? I believe he has four consecutive sentences for his securities fraud convictions, your honor. And I don't recall the exact number. Well, it's a lot of years, isn't it? Yes. And so if you just assume that he's transferred the maximum every seven years, that's a lot of different places for him to visit, right? Theoretically, but again, theoretically isn't the standard for capable repetition. You're going to have to help me on this. You're going to have to help me on this. You keep saying you cannot do it, establish it theoretically. You cannot establish it by hypotheticals. But if you establish it by actuality, then there's actual resumption. I don't see how you resolve that that problem here. Your honor, because he hasn't shown that there is a resumption of the actual activity. And there's also two prongs to the whole repetition argument. That's the very concept I'm talking about. And that is capable of repetition and avoiding review means the conduct that is sought to be enjoined has not yet been resolved, but there is a risk that it could. Yes, there is a risk that it could, but that doesn't meet the McAlpine test. If I could move on to the system-wide argument, which was also addressed by council during their argument, they've indicated that Mr. Brooks has been challenging a system-wide policy. And what I'd like to focus on is the policy at issue. The parties are in agreement that Mr. Brooks has been requesting a movement pass and that movement passes are governed by administrative regulation 300-55. And that's included as an attachment to our motion for summary judgment. I think it's important to note that the system-wide test regarding mootness requires that a plaintiff challenge a policy that generally applies in a uniform fashion throughout the system. And what I'd like to point to court to is to that administrative regulation regarding passes. It relates to offender movement in general, which includes passes and specifically states that it is to be applied and implemented in a facility-specific way. And that's based on the fact that under different security levels and classifications, basically there's no one-size-fits-all. Are you saying that the Department of Corrections said two different things as to why he shouldn't get the pass after it was revoked in Fremont. Number one, security. And then Ms. Russell then it ain't my job. That belongs to the medical coordinator. Those are two different reasons given. What was the security difference as to this prisoner or system-wide at Fremont during the period when he had the pass and during the substantial amount of time when he did not have the pass? What was the security difference? Sure. I'm happy to discuss that and I'm glad you brought it up, Your Honor. The security difference is addressed. First of all, it's statutorily based. Colorado revised statute. Actually, as to this defendant in this, why was he at security risk when diabetics were not? No diabetics were as far as we can tell. Your Honor, two things, if I may. First of all, we're dealing with two different levels of facilities. Fremont Correctional Facility and Sterling Correctional Facility. No, no, no. I'm talking about Fremont. While he was at Fremont, what were his security risks when he had the pass and what was his security risk when he didn't have the pass? Okay. So the declaration of Julie Russell addresses security concerns, but also they relate to the fact that the Medline Pass that he had briefly in 2012 is specifically created for individuals who have medical needs and need to take medication with meals. It's not a infinite list of inmates that can go through that line. It creates security issues with any movement that's uncontrolled. Wait a minute. Why did he qualify from March to June 2012 and did not qualify after that? Because he was taking medication that required him to go eat with his medication. So the record indicates that once he quit that medication, yes, it took the password. It did not. It expired. Yes. At Sterling, is he taking medication that he has to have the pass? There's no evidence in the record that I can't answer that based on the evidence in the record. So this indicates that you don't need to be taking medication to get the pass at Sterling, correct? No, it doesn't, Your Honor. There's no evidence in the record one way or the other what his medical situation or medications are right now. Why has he given the pass at Sterling? Is that an individual decision by an officer? Based on Mr. Brooks's statement at the motions hearing, Your Honor, it appears to be so. Yes. Does Ms. Russell have jurisdiction over Sterling? The record does not establish that, Your Honor. No, she had jurisdiction over a certain regional facilities, including Fremont, but there's no information as to Sterling. Is Sterling close to Fremont? No, there's several hours apart, Your Honor. So, one thing I wanted to address as well is counsel brought up bathroom access, or I'm sorry, the Medline pass that Mr. Brooks had briefly in 2012, and disputes the fact that when he had that pass, his meal attendance was not significantly improved. I would ask the court to look at that data. It's attached as an exhibit to our reply in support of summary judgment and shows the sheer number of meals that Mr. Brooks was missing did not substantially improve even when he had that pass. There's an argument that that is disputed. Do you dispute the percentages that were given to me by Ms. Robbins? Your Honor, I don't have percentages, so I can't What I have is the raw data, which was provided to the court in the diet miss log. Are you telling me there's no three-month period after June of 2012 where he had anything, I guess, more than 149? Would you say he had 149 misses? Yes, 149 misses in a three-month period, and I'm glad you asked this question, Your Honor, because if you look at that chart, you can see that beginning in 2013, his meal attendance improved significantly, and that he didn't have a Medline pass during that time. If, for example, you turn to 2013, and in particular, starting from May onward, his meal attendance skyrockets. It goes up. What does it look like in 2014? It's great in 2014 compared to 2012, and I think, Your Honor, part of this is because he had been placed on Humira. Wait a minute. Wait a minute. Wait a minute. You're telling me if I go through this diet miss chart, I do it on my own rather than you doing it for us, that I can go to three-month periods throughout that whole time, and 149 misses. He seldom goes significantly over that. Correct. He's missing an average of 50 meals a month in 2012, the three months he has the pass. Then after that, he stays in the 50s for several more months. There's a brief uptick between October and December of 2012, and then it goes back down again. When we get to March of 2013, which is less than a year later, he's only missing eight meals. He's only missing nine meals in April. The data itself is extremely telling as to Mr. Brooks' meal access because it wasn't significantly between the past. My question is, does your concept apply for every three-month period that's on this chart, and that is that there was no significant increase in missed meals? Again, Your Honor, the only brief uptick was a three-month period between October and December of 2012. Just answer my question. My question is, if I look at any three-month period, there's going to be no significant uptick in missed meals. Correct. Why don't we have a fact question here for the jury on reasonableness? Obviously, your opposing counsel disagrees with that interpretation. We're here on summary judgment. Why shouldn't a jury have evaluated this record? Well, crucial to the court's decision below, was the fact that Mr. Brooks conceded that adult undergarments are reasonable for individuals who have uncontrolled incontinence, and then also admitted that he, in fact, suffers from uncontrolled incontinence. He had conceded this fact he had tried to argue, which was that they were categorically unreasonable. Are you taking his statement out of context? No, Your Honor. Were you talking about his own situation, or was the question posed to him, you know, if you have this type of condition, which you have, is it helpful to have these diapers? And he said, yes, these older people, it seems to help them. I don't see that as a concession of his position in this case. Your Honor, and I believe the statement you're referring to, he said later. What I'm referring to are the three separate statements he made at the trial court level, acknowledging that he had uncontrolled incontinence. And I'm referring to three entirely separate statements of him explaining in detail the unpredictability of his condition. Volume 7, page 238 to 239, page 246, and page 262. And those are all in his deposition from 2018, before the summary judgment briefing in this case, Your Honor. And so the undisputed facts before the court at that time showed that they would be reasonable for someone with Mr. Brooks's condition that he himself admitted to having. Okay. Are there any other questions from the panel? Thank you, Ms. Lorenz. And Ms. Smith, if you'd put on a three-minute model, please. Judge Tempkowitz, three minutes, did you say? Yes, sir. Yes. Okay. I don't know how you want to put your model, but you may proceed. Ms. Robbins, what do you say about Ms. Lorenz's assertion that if you check, as she did, every three-month period following June 2012, when he didn't have the pass, it will show no significant additional missed meals over the 149 during the period when he had the pass? That is a false assertion, Your Honor. And in fact, from, I believe it was October 2012 to January 2013, Mr. Brooks missed almost 80% of his meals as a result of being offered only diapers. How many meals? How many meals is that? I'm really sorry. I don't have the raw data for that three-month period. I do have the raw data for the eight-month period directly proceeding after the meal pass was revoked. Does that average, does that eight-month period average out to more than 149 for a three-month period? Yes, it averages out to a meal miss rate of 64%, so almost two-thirds meal miss rate, Your Honor. And as opposing counsel recognized, Mr. Brooks was shortly thereafter put on Hemira, which did manage some of the effects of his disability, especially the pain. However, that does not undermine the fact that the movement pass in his most dire time of disability granted him additional access to his meals. All right. Does the record indicate that at Sterling, that he is on medication and that's why the pass was resumed? Your Honor, I believe- They're saying the justification for the pass is only if he's taking meds. Okay. At Sterling, has he resumed taking the meds and that's why they granted the pass? And does the record show that? No, Your Honor. I believe it was a clinical services administrator, Ryder May. She granted the pass just based on Mr. Brooks' request, which goes towards the voluntary cessation argument that my co-counsel was making. Mr. Brooks, as soon as this court rolled in his favor and remanded to the district court for resumed trial, the CDOC basically transferred Mr. Brooks and then granted him the accommodation that he wanted, which is enough to create a genuine issue of material fact regarding the behavior here. I would like to also- The final point that Ms. Lorenz made, and that is that your client agreed that the adult undergarments would be a reasonable approach for incontinent prisoners. Why doesn't that concession effectively establish a reasonable accommodation here? Your Honor, because Mr. Brooks' disability is not best characterized as incontinent. As opposing counsel concedes in page 7 and page 53 of their briefing, Mr. Brooks is able to, if he has time to use the restroom before mealtimes, have a 30-minute window where he will reasonably not have a flare-up. If Mr. Brooks is just allowed to use the bathroom before going to mealtimes, he will not suffer from incontinence. That's why the diapers are an unreasonable accommodation. And I would like to point out that we also, during Ms. Lorenz's argument, found the record site for the dry cell at Sterling. It's volume 7, page 283. It's Exhibit L to CDOC's own motion for summary judgment. So that is evidence within the record. I'm sorry that we overlooked it before. However, I do feel like it's pertinent to the considerations here. But when you look for that, did you look, have we confirmed that it was a dry cell at Fremont? I forgot. It's a dry cell at Sterling, Your Honor, but because the injunctive relief sought here is I understand it, but at Fremont have we confirmed that he was in a dry cell? No, Your Honor, just at Sterling. Okay, all right. Your time's expired and the case shall be submitted.